# CASES

IN THE

# SUPREME COURT OF ILLINOIS.

---

## NORTHERN GRAND DIVISION.

### SEPTEMBER TERM, 1871.

---

JEREMIAH TERWILLIGER

*v.*

THE GREAT WESTERN TELEGRAPH COMPANY *et al.*

1. INCORPORATION—*telegraph company, fraudulent organization.* A number of persons organized a telegraph company, and one of the number subscribed for nearly all of the stock and transferred it to another person to hold as trustee, and to represent and sell the same, but no money was to be paid by those organizing the company, and such subscriber, by contract with the company, undertook to build two thousand miles of line, but the agreed price was largely above the cost of construction; an election was held, where a large number of well known business men, not stockholders, or consenting thereto, were elected directors; a circular was issued referring to the objects and prospects of the company, and the names of these persons were given as directors, and in the same circular persons were solicited to subscribe for stock, and it was stated that on the

payment of forty per cent on the share a certificate of stock would be issued, and no further call would be made thereon. It was also provided, by a by-law, that no general meeting of the stockholders, or election of directors, should be held until the two thousand miles of line should be built and equipped, or until the persons holding a majority of the stock should petition the president to call a meeting. Many persons became subscribers and paid forty per cent on their stock, and four hundred and seventeen and one half miles of line was constructed at a cost of $126,550.90, and $25,000 had been paid on work not completed: *Held*, that the scheme was fraudulent, intended to enrich the contractor, and the plan so devised that the *bona fide* stockholders should not have any control of the affairs of the company, by electing directors, until two thousand miles of the line should be completed.

2. It was further held, that the *bona fide* stockholders should have relief, and that the lines constructed belonged to the subsequent subscribers whose money built them, and that the contracts should all be set aside; the amount of money paid by the subscribers ascertained, and certificates of stock to be issued to them so far as paid for, at forty per cent. An election was directed to be called for a new board of directors by such stockholders, at which election only actual holders of stock subscribed and paid for should be allowed to vote, and if a settlement should not be made by the new directors with the contractor, satisfactory to the court, the cost of constructing the lines already built, as nearly as possible, to be ascertained and the contractor to be allowed the cost and a reasonable compensation for his time and labor, and the court was directed to render a decree against him for any excess, to be paid to the treasurer appointed by the new board. The president and secretary were required to produce all books and papers that might be necessary in the adjustment, and if the company, as now organized, interpose any obstacles in the way of carrying the orders of the court below into execution, a receiver to be appointed to take charge of the entire affairs of the company.

Appeal from the Circuit Court of Cook county; the Hon. E. S. Williams, Judge, presiding.

Messrs. E. & A. Van Buren, for the appellant.

Messrs. Gookins & Roberts and Mr. Jesse O. Norton, for the appellees.

Mr. Chief Justice Lawrence delivered the opinion of the Court:

In December, 1867, Selah Reeve, one of the defendants herein, united with six other persons to form a corporate company,

under the act of 1849, to be known as the Great Western Telegraph Company. The articles of association were duly signed by them, and subsequently filed in the office of the Secretary of State, who issued the requisite certificate. By the terms of the articles, the capital stock was to consist of $3,000,000, divided into one hundred and twenty thousand shares of $25 each. Valentine F. Gardner, John Hall, and Dwight Johnson, all resident in the State of New York, were described in the articles as holding each one share; Josiah Snow, of Chicago, as holding one thousand shares ; David A. Gage, of Chicago, one thousand shares; Hasbrook Reeve, of New York, one hundred shares, and Selah Reeve, of Chicago, as holding one hundred and seventeen thousand eight hundred and ninety-seven shares, thus making the entire number of one hundred and twenty thousand shares. This stock, which the corporators thus professed to hold, was purely fictitious. No money was paid by any of them, and the stock represented no value. Selah Reeve, who professed to hold nearly all of it, was insolvent, and a few months thereafter filed his petition in bankruptcy and received his discharge as a bankrupt.

On the 13th of January, 1868, the corporators met and elected a board of directors, consisting of Gage, Snow, Hall, Hasbrook Reeve and Selah Reeve. Gage was elected president.

On the 25th of March, 1868, a written contract was entered into between Selah Reeve, who had previously resigned his place as a director, and the company, through Gage as president, for the construction by Reeve of two thousand miles of line, on routes to be designated by the company. No time was specified for the commencement of the work or for its completion, and no rate of compensation per mile was fixed, but the company agreed, by the following stipulation, to transfer the entire stock to Reeve on the execution of the agreement:

"In consideration of the aforesaid covenants and agreements, to be faithfully kept and performed by the said contractor,

the said Great Western Telegraph Company doth hereby covenant and agree to and with the said Selah Reeve, to issue and deliver to him certificates for shares in the capital stock of the said Great Western Telegraph Company, to wit: one hundred and twenty (120) thousand shares, on the execution of this agreement; the said shares to be owned and represented by the said Selah Reeve, in all meetings of the shareholders of said company, until such time as the same shall be subscribed, and fully paid for by other parties."

Contemporaneously with the execution of this agreement, Reeve assigned to Snow, the secretary and treasurer of the company, the one hundred and seventeen thousand eight hundred and ninety-seven shares originally subscribed by him, in trust, to sell the same to such persons as either he or the company could procure to subscribe to the stock, at the rate of $10 per share, and to pay over the proceeds to Reeve under his contract with the company, or any contract supplementary thereto.

The next day a supplementary agreement was made and executed between Reeve, the company, and Snow as trustee. By this agreement an irrevocable authority is given to the trustee to sell stock, through the agents of the company, to subscribers at $10 per share, the company paying to the trustee the money thus received, less a commission of 50 cents per share to be allowed to agents, and the trustee paying it to Reeve as fast as he should construct the line, in sections of ten miles each, to the satisfaction of the company. This contract also specifies the rate to be paid per mile for the construction of the line. The agreement also provides, that the trustee shall represent all the stock assigned to him by Reeve, except so much as may be subscribed and paid for by other persons.

The rate of compensation to be paid Reeve, was, as shown by the evidence, largely in excess of the cost of construction.

The next step of these parties was to put their scheme in a position to command the public confidence, and enable them

to procure subscriptions and money. To this end they proceeded, on the 30th of March, four days after the execution of the final contract between the company and Reeve, to elect twenty-two additional directors. These new directors were selected from well known citizens and men of business in Chicago, but they were not stockholders. Some of them afterwards did subscribe, but the greater part refused to do so, or to act as directors. Of the few who subscribed, we infer from the record, only one paid any money on his subscription.

The parties conducting this scheme, having thus placed themselves in a position to impose upon the public by the unauthorized use of names that would command confidence, proceeded to issue a prospectus, setting forth the organization of the company with these names as directors, stating that the company was established under State laws and an act of Congress, for the purpose of cheapening telegraphic correspondence in the West, and that the stock would be apportioned, according to population, to the cities and villages of Illinois, Wisconsin, Minnesota, Michigan, Iowa, Indiana, Missouri, Kansas, and Nebraska. The prospectus further stated, that the stock was $3,000,000, divided into shares of $25 each, and that on the payment of $10 on each share, a certificate of stock for $25 would be issued and no further assessments would be made.

Prior to the election of the twenty-two new directors the old board had adopted by-laws. The first of these by-laws provided, that the *first* annual meeting of the stockholders of the company should be held within ninety days, after two thousand miles of the company's lines had been equipped with wires. Another by-law provided for the election of directors whenever any number of shareholders, holding a majority of the shares, shall present a written request, addressed to the president, for a meeting of shareholders for that purpose.

The prospectus did not disclose the fact, that a contract for the construction of two thousand miles of line had already

been made, and that all the stock, except an insignificant portion, had been placed, without payment, in the hands of a trustee of the contractor, with power to represent the same. Neither did the persons who were induced to become subscribers know, that until about $1,500,000 should be subscribed, their money could be controlled by this trustee, and that they would have no voice in the management of the company, even by voting for directors, until two thousand miles of line should be constructed, unless the trustee should choose to have an election called.

By means of this prospectus, and the solicitation of agents who received a commission, large amounts of money were subscribed. As the money came in, Reeve began to construct lines under his contract. Another prospectus was issued in 1869, in which it is stated that three hundred and thirty-three miles of line were in operation on the 31st of July, 1869, that the company owed no debt, and that the net earnings of the preceding quarter, on the Milwaukee division, were at the rate of eighteen per cent on its cost. This prospectus further stated that there were already over two thousand subscribers to the stock among business men over various routes.

The evidence shows, that up to the 30th of June, 1870, Reeve had built four hundred and seventeen miles and a half of line, for which he had been paid $126,550.90, and that he had also been paid $25,000 on work not completed.

It should be further stated, as a part of the history of this transaction, although not important in the decision of the case, that on the 27th of March, 1868, another agreement had been made between Reeve, Snow the trustee, and the company by its president, by which Snow was appointed the agent to dispose, by subscription, of the stock conveyed to him by Reeve, and on the 26th of October, 1868, still another agreement had been made between the same parties, modifying in some unimportant particulars the previous agreements, and providing that after the completion of the two thousand miles of line, contracted for in the previous agreements, and the payment

therefor to Reeve, the trustee should reassign to the company all the capital stock then remaining in his hands. It was further stipulated, that if the cost of construction should reduce the net profits of Reeve below twenty per cent of the agreed price, then the twenty per cent profit should be made up to him.

Among the subscribers to the stock was Terwilliger, the appellant in this case. He took one hundred shares and paid $600, leaving a balance to be paid of $400, to complete the forty per cent. In November, 1869, he went to the office of the company, in Chicago, and requested a certificate of stock to the amount of his payments. He was told that certificates could not be issued until the full payment of forty per cent. He then offered to pay the forty per cent, and was told that payments would not be received faster than they were called for by the directors. His interview was with Selah Reeve, and the acting secretary, a son of the secretary, Snow.

Up to the time of the commencement of this suit no certificates of stock had been issued. At least we infer this from the fact that Gage, the president, testifies he had never, to that date, signed any. We also infer from this statement, and from what was said to Terwilliger at the office, that the directors had never called for the entire forty per cent of the subscriptions, upon the payment of which the certificates were to be issued. In view of all the facts, the charge in the bill is not improbable, that the parties managing the company intended not to call in the entire forty per cent, and thus to prevent the issue of stock certificates, since, by the terms of the subscription, the payments were to be made when the directors should order, and the certificates were not to issue until the forty per cent should be paid.

Terwilliger being thus refused his certificate of stock, filed a bill in behalf of himself, and other stockholders who might choose to come in and be made parties. He tendered payment of the balance due on his subscription, and asked that

he be decreed his certificate of stock ; that the contract be-
tween the company and Selah Reeve should be set aside as
fraudulent ; that the defendants be decreed to account for the
excess of money paid to Reeve above the cost of building the
lines; that a receiver be appointed, and for general relief. The
Telegraph Company is made a defendant, as are also Selah
Reeve, Snow, and Gage, who are charged with fraudulent com-
bination.

About thirty stockholders came in and were made co-com-
plainants.  The only relief granted by the circuit court was
a decree for the issue of the certificates of stock, on tender of
the balance due.  Terwilliger appealed.

An examination of this record compels the conclusion, that
this entire scheme was planned and carried forward by Selah
Reeve, for the purpose of enriching himself at the expense of
the deluded stockholders.  The facts that we have briefly
stated are susceptible of no other explanation.  By the arti-
cles of association he held all but an insignificant fraction of
the stock.  Four of the corporators lived in New York and
Brooklyn, and we hear nothing further of them.  The other
three, Reeve, Snow and Gage, are residents of Chicago, and
manage the scheme.  Of Gage it is but justice to say that he
was placed upon the stand as a witness, by complainant, and
testified that he received no salary as president, and had made
no money out of the enterprise.  He desired to have organ-
ized a new telegraph company in opposition to the existing
monopoly, and he subscribed to a hundred shares of the
stock assigned by Reeve to Snow, and paid $1000 thereon.
This testimony is not disputed, and his culpability consists
not in an attempt to enrich himself at the expense of others,
but in allowing himself to be made the passive instrument of
Selah Reeve.  He gave to the pretended organization the
sanction of his name as president, and it was his duty to see
that no improper means were taken to delude the public into
a subscription, and that the interests of those who might sub-
scribe should be protected.  In this duty he has grossly failed.

It is clear from the evidence that the entire management was left to Selah Reeve, and to Snow, who was an instrument of Reeve, coming here from New York when the company was organized, and taking the position of secretary and treasurer with a salary of $6000 per annum, not, however, voted by the board of directors, and having two sons also drawing salaries in subordinate positions. How completely the affairs of the company were left by Gage under the control of Reeve and Snow, is evident from his own testimony. He testifies that he knew nothing of the first prospectus, upon which his name appeared as president, with the names of the twenty-two new directors; that he knows nothing as to what money has been paid to Reeve, except as is shown by the books; that he does not know what salary is paid to Snow, or to his two sons, Henry and Eugene Snow, and does not know that Henry Snow was in the employ of the company.

We mention these matters for the purpose of showing, what is apparent all through the case, that Selah Reeve controlled the affairs of the company, and that in the contract for the construction of the two thousand miles of line, upon which he has received so large a sum of money, although he had resigned his nominal directorship, he was really, in behalf of the company, contracting with himself. He testifies that he wrote the agreements of March 25th, from slips drafted by different persons, and that Snow suggested some of the points and he suggested some. The very circumstances under which the contract was made were such as to show that the interests of the company were disregarded. The contract, indeed, was, in the then condition of affairs, almost a farce, for it was a contract between a company without a dollar of paid capital, or even a dollar of subscription that was expected to be paid, and one of their own number, who was a bankrupt, for the construction of two thousand miles of line, to cost from $600,000 to $1,200,000, according to the number of wires strung. We say this, by itself, was farcical, and it would have remained so but for the subsequent steps by which a great sum of
17—59TH ILL.

money has been drawn from unsuspecting subscribers, who knew nothing of this contract, and who, it is now gravely contended, must be bound by its terms.

The scheme is only a new variety of the many joint stock enterprises through which artful and unprincipled men, by the use of specious names and pretexts, so often enrich themselves, at the expense of the innocent subscribers to their stock. When they are brought within the jurisdiction of the courts, it is at once a duty and a pleasure to give whatever protection may be possible to their victims.

In the case before us it is apparent that the only real stockholders in this company are the persons who have paid their money as subscribers. The stock taken by the original corporators, under which the affairs of the company have been and still are controlled, was all a sham. It was purely fictitious, representing nothing. It was held chiefly by Selah Reeve, and he, through his trustee, Snow, has been able to control the affairs of the company, and to direct to his own pocket the money that has come from the *bona fide* subscribers to the stock. More than five hundred miles of line have been constructed and are in operation, for which Reeve has been paid an extravagant price, and yet the persons whose money built the line, are not permitted to have a voice in its management. Not even has a statement of its business been vouchsafed to them. The complainant was even, under a frivolous pretext, denied a certificate of stock. Yet, even if certificates of stock were to be issued, the subscribers would still be at the mercy of Reeve and Snow, so long as the contract is held valid by which the latter can represent the fictitious stock placed in his hands.

In our judgment, this entire contract with Reeve, even if the compensation to be allowed him for construction had been only reasonable, was a fraud upon the future shareholders, by whose subscription alone it was expected to construct the line. When the company issued its prospectus, and appealed to the public for subscriptions, it was bound to act in good faith.

Yet, no man can suppose that a single share would have been subscribed, if the character of these contracts had been known. The subscribers undoubtedly expected, and had a right to expect, that the affairs of the company would be managed by *bona fide* stockholders like themselves. On that faith they subscribed. They knew the lines were to be built, and they had a right to expect that the contracts for their construction were to be let to the lowest bidder, by a board of directors representing the interests of *bona fide* subscribers. Yet, in fact, their subscriptions had already been transferred by directors representing only fictitious stock, to a person recognized by the directors as the owner of this stock, and, necessarily, on such terms as he chose to dictate, and such as practically cut them off from any opportunity to control, by directors of their own choice, the expenditure of their money. Can it be seriously contended that this was not a fraud?

The scheme wears the same colors through its entire history. The contract with Reeve had a fraudulent purpose. Not a dollar was expended under it until money was obtained from *bona fide* subscribers, and not a dollar was expected to be when it was made. The election of the twenty-two non-stockholders as directors was fraudulent. The issuing of the prospectus with their names as directors was fraudulent. The prospectus itself, in avoiding all mention of this contract, and leading subscribers to suppose that *bona fide* directors, representing *bona fide* stockholders, would control the construction of the lines, was fraudulent. The provision of the by-laws, preventing the election of a board of directors by actual stockholders, except at the pleasure of fictitious stockholders, was fraudulent. The provision in the contract with Reeve, that Snow, the trustee, should represent the fictitious stock, and thus out-vote all *bona fide* stockholders, was fraudulent. The entire scheme, in short, was so arranged as effectually to leave the stockholders and their money at the mercy of Selah Reeve.

As we have already remarked, the actual stock of this company, and the lines which have been constructed, belong to the persons by whose money the work has been done. They are entitled to such protection as the courts can give them. To that end the decree of the circuit court will be reversed and the cause remanded. That court will render a decree setting aside all the contracts made between the company and Selah Reeve. It will ascertain what amount of money has been paid by the subscribers to stock. It will direct the company to issue certificates of stock to all subscribers who have paid their money, for as many shares as they are entitled to by the money paid, reckoning forty per cent paid upon $25, as giving title to a share. It will direct the president and secretary of the company to call an election of a new board of directors by such stockholders, at such time and place, and on such notice, as the court shall think proper, at which election only the holders of actual stock subscribed and paid for, will be allowed to vote. Unless such newly elected board shall make an amicable settlement with Selah Reeve, and one satisfactory to the court, it will ascertain, as nearly as possible, the cost of the lines constructed or partially constructed by him, and after allowing him such cost, and a reasonable compensation for his time and labor, will enter a decree against him for any excess of money he may have received from the company, to be paid to the treasurer appointed by the new board of directors. It will direct the president and secretary of the company to produce all books and papers that may be required, before the master or in court, and if these officers, or the company as now organized, interpose any obstacles or difficulties in the way of carrying the orders of the court into execution, the court will appoint a receiver to take charge of the books, papers, affairs and business of the company, requiring such bonds as may be necessary.

The costs in this court will be taxed against Selah Reeve, David A. Gage and Josiah Snow.

*Decree reversed.*