EUGENE C. BATES *et al.*

*v.*

THE GREAT WESTERN TELEGRAPH COMPANY *et al.*

*Filed at Ottawa October 31, 1890.*

1. CORPORATIONS—*subscription for stock—after issue to others.* Stock in a private corporation, after its issue to outside parties, as owners thereof, is not the subject matter of subscription. A subscription must be for such stock as the company still owns and has not parted with.

2. SAME—*stockholders—contract diminishing liability—creditors.* As against creditors of a corporation, no contract made by the company can be allowed to stand which attempts to change a subscription into a purchase of paid up stock, or to diminish the amount to be paid by the stockholder.

3. The issue of certificates of stock to subscribers on payment of forty per cent of their subscriptions does not make them the holders of full paid stock in such sense as that they can not be called upon for the remaining sixty per cent, at the suit of creditors of the corporation.

4. SETTING ASIDE DECREE—*for fraud.* Where the only allegation of fraud for the setting aside of a decree is the suppression of certain contracts relating to the subject matter of the suit, which could not have changed the result if they had been produced and the attention of the court called to them, the bill seeking to set aside the decree upon that ground can not be maintained.

5. PARTIES—*on bill to dissolve an insolvent corporation—and to appoint a receiver.* The stockholders are not necessary parties to a bill by creditors to dissolve an insolvent corporation, and have a receiver appointed to wind up its affairs. The court acquires jurisdiction to appoint a receiver of corporate assets upon service of process on the corporation.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

Mr. GEORGE L. PADDOCK, and Mr. WILLIAM C. NIBLACK, for the appellants:

A corporation has no power to enter into contracts of subscription of its capital stock in excess of the amount authorized by its charter, and such contracts confer no rights and create

no liabilities on stockholders. *Mackley's case,* L. R. 1 Ch. Div. 247; *Smith* v. *Mining Co.* 1 Mo. 428; *Lathrop* v. *Kneeland,* 46 Barb. 432; *Scoville* v. *Thayer,* 105 U. S. 143.

A corporation may receive in payment for its stock any property it may lawfully purchase. Cook on Stockholders, sec. 15, *et seq.*

When property is given for stock of a corporation the stock is full paid. *Steacy* v. *Railroad Co.* 5 Dill. 348; *Van Cott* v. *Van Brunt,* 82 N. Y. 535; *Young* v. *Erie Co.* 65 Mich. 111; 27 Pa. St. 416; 4 Clifford, 508; *Phelan* v. *Hazard,* 5 Dill. 45; *Spencer* v. *Company,* 36 Iowa, 407.

Upon the ground of the prevention of a multiplicity of suits at law, a court of equity has jurisdiction of this bill. *Reid* v. *Gifford,* Hopk. 416; *Brinkerhoff* v. *Brown,* 6 Johns. Ch. 151; *Cadigan* v. *Brown,* 120 Mass. 493; 1 Pomeroy's Eq. Jur. sec. 250, *et seq.; Murray* v. *Hay,* 1 Barb. Ch. 59; Story's Eq. Pl. secs. 533-539; Story's Eq. Jur. sec. 854; *Railroad Co.* v. *Schuyler,* 17 N. Y. 592; *Board of Supervisors* v. *Deyoe,* 77 id. 219; *Black* v. *Shreeve,* 7 N. J. Ch. 440; *Caro* v. *Pensacola,* 19 Fla. 766; Adams' Eq. 199.

The receiver is an officer of the court, subject to its jurisdiction and direction, and when the complainants come into court and submit to its jurisdiction, the court will inquire into the validity of the contracts upon which the receiver is threatening to sue, and will, if necessary, restrain him from bringing suits which will in the end be futile. *In re Weaver,* 2 M. & C. 441; *Blundell* v. *Gladstone,* 9 Sim. 455; *Ambrose* v. *Union,* 8 Beav. 43.

Mr. THOMAS J. SUTHERLAND, for the appellees:

The creditors of the company are not made parties defendant to the bill. *Richmond* v. *Irons,* 121 U. S. 54; *Tunesma* v. *Schuttler,* 114 Ill. 156.

The bill is not sufficiently specific as to the charges of fraud. *East St. Louis* v. *Millard,* 14 Bradw. 488; *Smith* v. *Brittenham,*

98 Ill. 188; *Newell* v. *Bureau County*, 37 id. 253; *Allen* v. *Woodruff*, 96 id. 23; *Klein* v. *Horine*, 47 id. 432.

As to the liability under the contract of subscription, see *Telegraph Co.* v. *Gray*, 122 Ill. 635; *Moran* v. *Prather*, 23 Wall. 501.

As to the right of a corporation to acquire its own stock, see *Railroad Co.* v. *Marseilles*, 84 Ill. 145; *Taylor* v. *Miami Expert Co.* 6 Ohio, 83; *City Bank* v. *Bruce*, 17 N. Y. 507; *Williams* v. *Manufacturing Co.* 3 Mich. 452; *State* v. *Smith*, 48 Vt. 266; *Clapp* v. *Peterson*, 104 Ill. 26; *Wemple* v. *Railroad Co.* 120 id. 196; *Mann* v. *Cooke*, 20 Conn. 177.

If the person subscribing was induced to do so by fraud or misrepresentations, he should have repudiated the contract at the earliest moment, and before debts were contracted by the company. After that his right to rescind is lost. *Upton* v. *Tribilcock*, 91 U. S. 55; *Hamilton* v. *Insurance Co.* 67 Ga. 145; Cook on Stockholders, secs. 52, 54; Taylor on Corp. secs. 537, 701, 738; *McCarthy* v. *Lavasche*, 89 Ill. 270.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

This is a bill filed, in pursuance of leave obtained to do so, in the Circuit Court of Cook County on September 4, 1888, by certain stockholders in the Great Western Telegraph Company, on behalf of themselves and such other stockholders as might become co-complainants with them, against said company and Elias R. Bowen, a receiver of said company appointed by said Circuit Court in another suit therein pending and hereafter mentioned as the *Terwilliger* suit, praying that certain orders entered by said Circuit Court in said Terwilliger suit on July 10, 1886, and January 10, 1887, making an assessment against the stockholders upon the unpaid balances of their subscriptions to the stock of the Company for the purpose of paying the proven claims against the Company, be set aside as to the complainants, who are the appellants here, and also praying

that said receiver be enjoined from bringing against complainants and the other stockholders the suits at law, authorized by said orders, for the recovery of the amount of such assessment. The Company and its receiver, defendants below and appellees here, demurred to the bill. The Circuit Court sustained the demurrer and dismissed the bill for want of equity. Such decree of dismissal has been affirmed by the Appellate Court, and the case is brought before us by appeal from the judgment of the latter Court.

On November 30, 1869, Jeremiah Terwilliger, a stockholder in said Telegraph Company, on behalf of himself and such other stockholders as might choose to come in, filed a bill in said Circuit Court against said company, and David A. Gage, its president, and Josiah Snow, its secretary and Treasurer, and one Selah Reeve, the contractor engaged to build the telegraph lines. The object of the Terwilliger bill, and its contents, in substance, are stated in *Terwilliger* v. *G. W. T. Co. et al.* 59 Ill. 249. After the cause was remanded to the Circuit Court, a decree was therein entered on November 16, 1872, in pursuance of the opinion of this Court in *Terwilliger* v. *G. W. T. Co. supra.* Various proceedings were afterwards had in said cause; a reference was taken to a Master to state an account between Reeve and the company as to the amount due for the construction of the lines; a cross-bill was filed by Reeve; a supplemental bill was also filed; a receiver was appointed; proofs were taken and findings made as to the number of creditors of the company and the amounts due them respectively, and as to the number of stockholders and the amounts of their subscriptions, etc.; a sale was made by the receiver of the assets and property of the company, and the proceeds of such sale were applied upon the debts, leaving a balance of about $375,000.00, exclusive of interest, due to the creditors.

After such sale and the application of its proceeds, and on April 10, 1886, the defendant Bowen, who had been appointed

as the successor to the former receiver, filed his petition in the said court, entitled in the original Terwilliger suit and also in the cross and supplemental suits, alleging that the company had no property, and that the stockholders (with the exception of a few who had paid in full) had only paid from five to forty per cent of their subscriptions to the stock, and that the remaining sixty per cent was still due and unpaid, and praying that a call be made upon the stockholders, who had not paid the full amount of their subscriptions. After a reference under said petition, and proofs taken, the orders of July 10, 1886, and January 10, 1887, heretofore mentioned were entered. The January order was merely a supplement to and extension of the July order.

The Great Western Telegraph Company was organized under "An Act for the establishment of Telegraphs" approved February 9, 1849, which provided that the persons associating themselves together for the purpose of constructing a line of telegraph should make, acknowledge, and record in the county clerk's office and in the office of the Secretary of State, a certificate specifying among other things "the capital stock of such association and the number of shares into which the stock shall be divided." The certificate organizing the appellee company, which bears date December 2, 1867, and was duly acknowledged and recorded as required by the Act, recites that "the amount of the capital stock of said association is $3,000,000.00 divided into 120,000 shares of $25.00 each."

The July and January orders above mentioned find the allegations of the petition to be true and decree that an assessment be made upon the stockholders of 35 per centum of the par value of the shares subscribed for by them, being $8.75 on each share, and that said stockholders pay said assessments to the receiver upon demand made by him. It is conceded that the complainants and the other stockholders have not paid any more than $10.00 on each share of $25.00, or 40 per cent of the face value of each share.

The bill in the present case sets forth the pleadings in the Terwilliger case and the decree therein of November 16, 1872, and the other proceedings therein as here referred to, and the organization of the company as here stated. The bill also sets forth in full an exact copy of the form of the subscription paper, or contract for subscription, signed by the stockholders, which is as follows:

"*Capital, $3,000,000; shares, $25; assessment not to exceed $10 on a share. Subscription list for the capital stock of the Great Western Telegraph Company.*

"We, the subscribers hereunto, for value received, severally, but not jointly, agree to take the number of shares in the capital stock of the Great Western Telegraph Company placed opposite our respective names, and pay for the same in installments, to-wit: Five per cent on amount paid in, and the balance as the directors, from time to time, may order. In consideration thereof the Great Western Telegraph Company agree that when forty per cent of the par value of the shares shall have been paid under such orders, and the installment receipts therefor surrendered to the company, the number of shares severally subscribed by the undersigned shall be issued to them as full paid stock of said company.

". . . . . . . . . . . . . . . . . is appointed agent to solicit and receive only the first installment of five per cent (fifty cents on a share) at the time of subscribing.

| NAMES. | Residence. | Date of Subscription. | No. of Shares. | |
|--------|-----------|----------------------|----------------|--|
|        |           |                      |                |  |

This is the exact form of subscription contract, which is set forth in *Great Western Telegraph Company* v. *Gray,* 122 Ill. 630. In the *Gray* case it was claimed, that the stockholder subscribing this contract was only liable to pay forty per cent

of the par value of each share, that is to say, $10.00 instead of $25.00 on each share, but we there decided, that the liability upon such contract was for the par value of each share, and that the stockholders, who had paid only forty per cent, could be called upon, for the remaining sixty per cent.

The order of assessment, mentioned in the declaration in the *Gray* case, is the same order which is sought to be set aside in the case at bar; and the ground, upon which the relief in question is now asked, is that there was fraud in the procurement of such order or orders of assessment. The charges of fraud, as made in the bill, are somewhat indefinite, but stripped of verbiage and sifted down to their real meaning they amount to this : that the Circuit judge, who entered these orders, was deceived and imposed upon; that there was a suppression of a part of the evidence which should have been presented to him ; that his attention was called only to the subscription paper signed by each stockholder, and not to certain contracts and other instruments executed in 1868 by Reeve and Snow and the Telegraph Company; that, if such contracts and instruments had been brought to the attention of the chancellor, he would not have entered the orders of assessment now complained of. In other words, the point is here made, that the contract of subscription as above set forth, considered in connection with the contracts and instruments so executed in 1868, will show each of the stockholders now complaining to be a purchaser of stock from Reeve at $10.00 per share, and not an original subscriber for stock at $25.00 per share ; and, upon this theory, the appellants claim, for themselves and those whom they seek to represent, that they did not contract directly with the company as subscribers for stock, but that Reeve was the owner of the stock and sold it to them, and that, therefore, they cannot be held liable for the sixty per cent remaining unpaid. We are unable to concur in the view which the appellants thus take.

The contracts and other instruments heretofore referred to as executed in 1868 will be designated, for the sake of brevity, as the Reeve contracts. Is there anything in the Reeve contracts, which can change or vary the liability of a subscriber to the subscription paper above set forth as we have decided such liability to be in the *Gray* case? We think not.

On March 25, 1868, a contract was made between Reeve and the Company by which he agreed to construct, equip and complete 2000 miles of telegraph line, and, in consideration thereof, the Company agreed "to issue and deliver to him certificates for shares in the capital stock of the Great Western Telegraph Company, to wit: 120,000 shares on the execution of this agreement; the said shares to be owned and represented by said Selah Reeve in all meetings of the shareholders of said company until such time as the same shall be *subscribed* and fully paid for by other parties." The whole number of shares into which the capital stock of the company was to be divided, as above stated, was 120,000 shares, and, at the date of this contract, 2103 of these shares were held by other parties, according to the statement in the certificate of organization, leaving only 117,897 shares to be issued and delivered under the terms of the contract.

On the same day, March 25, 1868, Reeve executed a trust deed to Snow wherein he assumed to "sell and assign to said Josiah Snow * * * (to take and receive the same from said Company) 117,897 shares of said stock, so agreed to be delivered as aforesaid. To have and to hold the same * * * upon trust to sell and dispose of the same to such persons as the said party of the second part (Snow) by himself, or through the Great Western Telegraph Company or any of his or their agents shall procure as *subscribers* to said stock, at a rate of not less than $10.00 per share, and to pay over and apply the proceeds of said stock * * * for the prosecution of the work at the times and in the manner and for the purposes prescribed in the before mentioned contract and all *supplements*

thereto, if any are made." Snow is also therein authorized
as the agent of Reeve to receive the stock from the company
and to sell and dispose of it by himself or through agents, and
apply the proceeds for the performance of the contract.

On the next day, March 26, 1868, a supplementary agree-
ment was entered into between Reeve and the Company and
Snow, as trustee, in which Snow is authorized "to employ the
Great Western Telegraph Company, or such other agents as
the trustee may appoint to sell and dispose of said stock by
*subscription*," and to agree with the company to "furnish and
transfer" to it such number of shares of the stock as it "may
procure to be subscribed for" at the rate at which the trustee
is empowered to sell the same, provided the company pays to
the trustee $10.00 per share less fifty cents per share to be
retained as a commission "for the sale or procurement of *sub-
scriptions* for said stock;" Reeve also agrees to procure and
transfer to the trustee the 2103 shares already subscribed for;
the Company agrees to aid in the "sale and disposal by *sub-
scription* of the stock;" the trustee is authorized to pay Reeve
for the work of construction at certain rates per mile out of the
moneys "resulting from sales of or *subscriptions* for said stock;"
the contract contains this provision: "the title and right to
represent the stock sold and assigned in trust by said Reeve
shall remain in the trustee until such time as the same shall
be fully paid for by parties purchasing or *subscribing* for the
same."

On March 27, 1868, Snow, as trustee, executed a power of
attorney reciting that he appoints "the Great Western Tele-
graph Company, by its proper officers, agents for the disposal
by *subscription* of the 117,897 shares" aforesaid, and also there-
in reciting, that he will deliver and transfer to the company
any amount of stock which it may procure to be *subscribed*
upon the payment to him of $9.50 for each share by the com-
pany in the manner prescribed in the foregoing agreements
and trust deed.

On October 26, 1868, another contract was made between the company and Snow, trustee, and Reeve, contractor, explaining and enlarging the former agreements, but it is not necessary to consider the October contract as the present appellants, and the other stockholders whom they seek to represent, signed their subscription papers in June, July and August, 1868, before the making of the October contract.

If these Reeve contracts, which have been set aside as invalid and fraudulent, could be regarded as valid and binding between the parties to them, what do they amount to? Reeve agreed to build 2000 miles of telegraph lines for the company, and the company agreed to pay him for so doing the sum of $9.50 out of the subscription money to be collected on each share of its stock; the contracts and trust deed and power of attorney above. mentioned together constituted an arrangement, by which the company sought to secure for itself the performance of the work by Reeve, and by which Reeve sought to secure for himself the money that was to be paid to him. When these papers were drawn, Reeve had performed no work for which he was entitled to have any of the stock; he never paid a dollar for any of the stock; no certificate of stock was ever issued to him, or to Snow as his trustee. If the company was spoken of as agent, it was only agent to apply a certain part of the subscription money towards the payment of the cost of constructing the lines. The Company was not agent for the purpose of selling full paid stock, or stock certificates, belonging to Reeve, or Snow, trustee, to third parties. The word "*subscription*" is used in almost every paragraph of the contract. When men *subscribe* for the stock of a company, it is for such stock as the company still owns and has not parted with. Stock, which has been issued to or passed into the ownership of outside parties, cannot be subscribed for; it is not then the subject-matter of subscription.

In the present case, the subscription contracts were made by the subscribers thereto directly with the company. There

35—134 ILL.

is nothing upon the face of the contracts to indicate that the company was taking the subscriptions as agent for Reeve or Snow. No one of these stockholders knew, when he signed the contract, that he was dealing with the company as agent; no one of them supposed that he was buying stock from Reeve or Snow; no one of them had any information that Reeve or Snow had any interest in the stock for which he was subscribing. It is averred in the bill in the present suit, that the stockholders knew nothing about the Reeve contracts when they signed their subscription papers, and that those contracts were never produced until long afterwards during the progress of the *Terwilliger* litigation. No representations were made to them by the officers of the company when they became stockholders, that they were buying full paid stock that had passed from the company to Reeve and Snow. There having been no such representations, and there having been no knowledge of the Reeve contracts, how can the stockholders now say to this receiver and to the creditors represented by the receiver, that their subscription papers do not mean what they say upon their faces, but that their true meaning can only be ascertained when they are construed in connection with the Reeve contracts?

Sometimes several instruments executed at the same time and as parts of one transaction may be regarded as one, but there is no such state of things here. The subscription contracts were not made at the same time with the Reeve contracts, nor between the same parties, nor in relation to the same subject matter. The subscriptions to the capital stock of a company are assets for the payment of its debts. The unpaid balances due upon such subscriptions belong to the creditors. As against creditors, no contract made by the company can be allowed to stand, which attempts to change a subscription into a purchase of full-paid stock, or to diminish the amount agreed to be paid by the stockholder, through such jugglery as is embodied in the Reeve contracts.

In passing upon the issues made upon the original bill in the *Terwilliger* case, we there said in regard to these same Reeve contracts: "This stock, which the corporators thus professed to hold, was purely fictitious. No money was paid by any of them and the stock represented no value. Selah Reeve, who professed to hold nearly all of it, was insolvent. * * * The rate of compensation to be paid Reeve was, as shown by the evidence, largely in excess of the cost of construction. * * * Up to the time of the commencement of this suit no certificates of stock had been issued. * * * The very circumstances, under which the contract was made, were such as to show that the interests of the company were disregarded. The contract, indeed, was, in the then condition of affairs, almost a farce, for it was a contract between a company without a dollar of paid capital, or even a dollar of subscription that was expected to be paid, and one of their own number, who was a bankrupt, for the construction of 2000 miles of line to cost from $600,000.00 to $1,200,000.00, etc. * * * In the case before us it is apparent that the only real stockholders in this company are the persons *who have paid their money as subscribers.* The stock taken by the original corporators * * * was all a sham. It was purely fictitious representing nothing. * * * In our judgment this entire contract with Reeve was a fraud upon the future shareholders, by whose *subscription* alone it was expected to construct the line. * * * The contract with Reeve had a fraudulent purpose. Not a dollar was expended under it until money was obtained from *bona fide subscribers,* and not a dollar was expected to be when it was made. * * * The decree of the Circuit Court will be reversed and the cause remanded. That court will render a decree setting aside all the contracts made between the company and Selah Reeve."

It will thus be seen, that in the *Terwilliger* decision this court held the Reeve contracts to be fraudulent, and ordered them to be set aside, and it will be further noted that, in that

decision, the *bona fide* stockholders are treated as original sub-scribers to the capital stock of the company, and not as pur-chasers of the fictitious stock claimed to be owned by Reeve.

It is claimed by the appellants, that this Court released the stockholders from the obligation to pay any more than forty per cent on their contracts by directing, in the opinion in the *Terwilliger* case, that certificates of stock be issued to those who had paid the forty per cent. Such cannot be regarded as the effect of the opinion in that case. There the rights of creditors were not involved; the controversy there was between *bona fide* stockholders on the one side, and the pretended hold-ers of fictitious stock, who sought by means of such fictitious stock to control the company, and crowd out the *bona fide* subscribers and prevent the latter from obtaining their certi-ficates, on the other side. Here the controversy is between creditors and subscribers to the capital stock. There, the court merely granted a specific performance of the contract of subscription, which authorized the subscriber to have a certi-ficate when he paid forty per cent, but this did not make him a holder of full paid stock in such sense that he could not be called upon to pay the remaining sixty per cent of his sub-scription. The certificate is merely one of the evidences of the existence of the relation of stockholder. (*Union Mut. Life Ins. Co.* v. *Frear Stone Co.* 97 Ill. 537; *Wemple* v. *St. L., J. & S. R. R. Co.* 120 id. 196; *New Albany & S. R. R. Co.* v. *Mc-Cormick,* 10 Ind. 501; *Rutter* v. *Kilpatrick,* 63 N. Y. 606.; *Wheeler* v. *Millar,* 90 id. 357; *Fulgam* v. *Macon & Brunswick R. R. Co.* 44 Ga. 598; *Mitchell* v. *Beckman,* 64 Cal. 121; *Chester Glass Co.* v. *Dewey,* 16 Mass. 94.) We passed upon this precise point in the *Gray* case, *supra,* where it was said: "The company's promise, when forty per cent is paid, to issue certificates for the shares as full paid stock, may well consist with defendant's promise to pay the par value of the shares, and the issuance of such certificates after the payment of forty per cent may well consist with the liability remaining on the

defendant to pay the other sixty per cent." This being so, the liability is not changed by the fact that the company was heretofore directed by order of court to do what it contracted to do in the subscription paper. Nor was the liability of the *bona fide* stockholders to the creditors of the company diminished in any way by the fact, that Reeve, and those acting with him, tried to defraud such *bona fide* stockholders through the medium of the scheme embodied in the Reeve contracts. (*Un. Mut. Life Ins. Co.* v. *Frear Stone Co. supra.*)

We are, therefore, of the opinion that it would have been the duty of the Circuit Court to enter the orders of assessment if the Reeve contracts, which are alleged to have been concealed from its notice, had been brought to its attention and had been fully considered in connection with the subscription papers. As the only fraud charged consisted in the alleged suppression of those contracts, and as their production could not have changed the result, the demurrer to the bill was properly sustained.

As to the point that the stockholders were not parties to the proceeding in which the orders of assessment were entered, a majority of this court held, after careful consideration, in *Great Western Telegraph Co.* v. *Gray, supra,* that it was not necessary for the stockholders to be before the court. It was there said: "There was no purpose in that case (*Chandler* v. *Brown,* 77 Ill. 333,) to depart from the well established general rule that a court acquires jurisdiction to appoint a receiver of corporate assets by service of process upon the corporation. The stockholder is represented in his interest, as such, by the presence of the corporation. (2 Morawetz on Corp. sec. 822; *Ward* v. *Farwell,* 97 Ill. 593 ; *Glenn* v. *Williams,* 20 Md. 93 ; *Sawyer* v. *Upton,* 91 U. S. 56.) * * * In order for the board of directors to have made a valid order for payment, it would not be contended, we presume, that defendants should have been before the board. No more, we conceive, was it necessary that defendant should have been before the court

when it, in place of the directors, made the call or order of assessment."

Without consideration of the other objections, several of which have much force, made by the appellees to the power of a court of equity to entertain jurisdiction of a bill, like this, which seeks to review or set aside such orders of assessment as those which have been herein under discussion, we think that, for the reasons above stated, the Circuit Court committed no error in dismissing the present bill.

The judgment of the Appellate Court is, therefore, affirmed.

*Judgment affirmed.*

CRAIG and SHOPE, JJ., dissenting.